**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JACOB GORSKY and OLESYA GORSKY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-16-2877 |
| | § | |
| HARRIS COUNTY, TEXAS, HARRIS | § | |
| COUNTY PRECINCT 4, CONSTABLE'S | § | |
| OFFICE, DEPUTY SMALL, DEPUTY | § | |
| BERRY, DEPUTY GUAJARDO, and | § | |
| CORPORAL RIVAUX, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Jacob and Olesya Gorsky sued Harris County, Texas; three deputies from the Harris County Precinct 4 Constable's Office—Jesus Guajardo, Patrice Small, and Glenn Berry, Jr.—; and Corporal Benjamin Rivaux from the Constable's Office, under 42 U.S.C. § 1983. The Gorskys allege that the deputies arrested Mr. Gorsky without probable cause; illegally entered and searched the Gorskys' home; and used excessive force on the Gorskys while handcuffing them. The Gorskys allege that Harris County had a policy or custom of allowing its law-enforcement officers to use excessive force and illegally enter citizens' homes, and that Corporal Rivaux failed to supervise the other officers while they violated the Gorskys' rights.

After discovery, the defendants moved for summary judgment and asserted qualified immunity. (Docket Entry Nos. 48, 51, 53). They argue that undisputed record evidence shows that, as a matter of law, the officers had the Gorskys' consent to enter the home, had probable cause to arrest Mr. Gorsky, and did not use force that caused any injury. Harris County also argues that the Gorskys have not shown a custom or practice sufficient to support municipal

liability. The Gorskys responded, and the defendants replied. (Docket Entry Nos. 68, 72, 73, 74). The court ordered the Gorskys to rewrite their response, using pincites to identify the specific record evidence they argued supported their claims. (Docket Entry No. 75). The Gorskys filed a revised response brief, and the defendants replied again. (Docket Entry Nos. 76, 77, 78, 79).

After a careful review of the record evidence, briefs, and the applicable law, the court grants Harris County's motion for summary judgment, (Docket Entry No. 48), and denies in part and grants in part the individual officers' motions for summary judgment, (Docket Entry Nos. 51, 53).[1] The reasons are explained in detail below.

## I.     Background

Jacob and Olesya Gorsky lived in Spring, Texas. (Docket Entry No. 68-7 at 1). Their neighbors, the Koczman family, and the Gorskys, did not get along. Both families frequently called the local police station, Harris County Constable Precinct 4, to complain about the other. The complaints ranged from the Koczmans allegedly throwing tree limbs into the Gorskys' yard and dog feces into their pool, to the Gorskys allegedly directing rainwater into the Koczmans' yard and using a loud pool pump. (Docket Entry No. 48-2 at 2–6). The two families placed at least 19 complaint calls to Precinct 4 between 2013 and 2019. (Docket Entry No. 48-1; Docket Entry No. 48-2 at 2–6).

On the evening of February 20, 2016, the Gorskys threw a pool party. (Docket Entry No. 68-6 at 1). The Koczmans called the police station with a noise complaint. Two deputies— Berry and Guajardo—responded around midnight. (Docket Entry Nos. 51-5, 51-6). Mr. Gorsky

---

[1] Corporal Rivaux filed an amended motion for summary judgment, (Docket Entry No. 53), which moots his original motion, (Docket Entry No. 46).

waived a pool rod at the officers when they arrived; they thought he at least appeared to be drunk. (Docket Entry No. 51-6 at 1; Docket Entry No. 68-2 at 67). Deputies Berry and Guajardo left after warning the Gorskys to "quiet down." (Docket Entry No. 51-6 at 1).

A few hours later, the Koczmans called the police station a second time, reporting that their security camera had caught a woman, who appeared to be Olesya Gorsky, cracking an egg on the Koczmans' car. (Docket Entry No. 51-8 at 3). Deputies Guajardo and Berry returned, along with Deputy Small and Corporal Rivaux, who was training Deputy Small. (Docket Entry No. 51-9 at 1). The officers watched the video, which showed a woman walking over to the Koczmans' car and smashing an egg on the windshield. (Docket Entry No. 48-4; Docket Entry No. 51-10 at 2). After watching the footage, the officers went next door to the Gorskys' home.

The officers rang the doorbell, and Jacob Gorsky opened the door. (Docket Entry No. 51-11 at 2). Deputy Small recorded the encounter with her police microphone. (Docket Entry Nos. 48-6, 51-12). Corporal Rivaux told Mr. Gorsky that there was "an incident on video of [his] wife" and that he needed "to wake up [his] wife and have her come downstairs." (Docket Entry No. 51-12 at 2). Mr. Gorsky told the officers to "get out of it," but said that he would call his wife. (*Id.*). Mr. Gorsky then tried to shut the front door, but Corporal Rivaux and Deputy Berry said, "we're not closing the door," and they put their feet in the doorframe to prevent Mr. Gorsky from closing the front door. (Docket Entry No. 51-12 at 3; Docket Entry No. 68-1 at 47). Mr. Gorsky again tried to close the door, but the deputies kept their feet in place. (Docket Entry No. 51-12 at 3). Mr. Gorsky told the officers to "[g]et out, please. Get out of it." (*Id.*). They did not.

Deputy Guajardo then told Mr. Gorsky that he was "hindering an investigation," and that the officers had "every legal right to get in this house, put [Mr. Gorsky] in handcuffs, and take

[him] to jail." (*Id.* at 3–4). Mr. Gorsky agreed to fetch his wife and again asked the officers to take their feet out of the doorway. (*Id.* at 4). Deputy Guajardo replied, "[t]hat is not an option," and told Mr. Gorsky that he must either get Ms. Gorsky or the officers would handcuff him. (*Id.*). Mr. Gorsky replied that the officers should handcuff him. (*Id.*).

Deputy Guajardo[2] then handcuffed Mr. Gorsky, and Corporal Rivaux told him to "have fun in Harris County." (Docket Entry No. 68-3 at 85). Mr. Gorsky states that he screamed in pain, (Docket Entry No. 68-5 at 26), although Deputy Small's audio recording did not record any screams, (Docket Entry No. 48-6). Corporal Rivaux also asked Mr. Gorsky if he wanted to call his wife to tell her that he was going to jail. (Docket Entry No. 68-3 at 85). Deputy Guajardo then took Mr. Gorsky's arm and led him to the patrol car, where he placed Mr. Gorsky inside the car. (Docket Entry No. 51-10 at 3). Security-camera footage shows Deputy Guajardo leading Mr. Gorsky across the lawn to the patrol car. (Docket Entry No. 51-14).

Corporal Rivaux knocked on the already-open front door and called out "Police Department." (Docket Entry No. 68-3 at 86). Olesya Gorsky testified that she "heard a commotion in [the] front foyer" and saw the officers, "already in the house," turn the foyer light on and knock "on the side of the wide-opened front door." (Docket Entry No. 68-6 at 2–3). Ms. Gorsky came to the front door and asked the officers, "[w]hat are you doing, guys?" (Docket Entry No. 51-12 at 5). Corporal Rivaux told Ms. Gorsky to "[c]ome on out," but Ms. Gorsky expressed concern that her son was in the house. (*Id.*). Ms. Gorsky stated in her declaration that,

---

[2]  The Gorskys inaccurately state in their response that Deputy Berry testified that it was Corporal Rivaux who handcuffed Mr. Gorsky. (Docket Entry No. 68 at 10). Deputy Berry stated in his deposition that he did not remember who handcuffed Mr. Gorsky, (Docket Entry No. 68-1 at 52–53), and stated in his sworn affidavit that Deputy Guajardo handcuffed Mr. Gorsky, (Docket Entry No. 51-13 at 3). Corporal Rivaux's deposition also states that it was Deputy Guajardo who handcuffed Mr. Gorsky. (Docket Entry No. 68-3 at 85).

"without explaining anything or offering [her] to get dressed, [the] police rudely turned [her] around and handcuffed [her] behind [her] back," (Docket Entry No. 68-6 at 3), and Corporal Rivaux "grabbed [her] naked shoulders, twisted [her] around and, with his face inches from [her] face stuck his finger in [her] bare chest and said 'you egged the car.'" (*Id.*) Corporal Rivaux then explained that the Koczmans' security camera had filmed a woman cracking an egg on their car and encouraged Ms. Gorsky to confess. (Docket Entry No. 51-12 at 8). Ms. Gorsky suggested that the egg-cracker may have been a friend from their pool party and denied any involvement. (*Id.*).

Ms. Gorsky continued to tell the officers that her son was sleeping inside. Corporal Rivaux asked if they could "come in and put [her]" in a dining room chair. (*Id.* at 10). Ms. Gorsky, handcuffed, answered, "[y]eah, yeah." (*Id.*). Ms. Gorsky testified that "they all moved to the dining room [and] pushed [her] in a chair." (Docket Entry No. 68-6 at 4). Deputy Small asked Ms. Gorsky where her son was. (Docket Entry No. 51-12 at 11–12). Ms. Gorsky testified that Deputy Small then "disappeared into the house for a while." (Docket Entry No. 68-6 at 4).

Corporal Rivaux returned after having left to watch the security-camera footage a second time. (Docket Entry No. 51-12 at 19). Corporal Rivaux told Ms. Gorsky that he had "just watched the video" and that the woman in the video was Ms. Gorsky. (*Id.*). Ms. Gorsky again denied having "egged" the Koczmans' car, but Corporal Rivaux issued her a citation for criminal mischief and a trespass warning. (*Id.* at 20–21). The officers uncuffed Ms. Gorsky and followed her into her room to retrieve Mr. Gorsky's identification. (*Id.* at 22–25).

Deputy Guajardo then called the District Attorney's Office to request authority to arrest Mr. Gorsky for interfering with public duties.[3] (Docket Entry No. 51-10 at 4). The District Attorney's Office declined the charge. (*Id.*). Deputy Guajardo released Mr. Gorsky from the handcuffs and from the patrol car. (*Id.*). He had been sitting, handcuffed, in the patrol car for about an hour. (Docket Entry No. 68-7 at 4–5).

Days later, the Gorskys filed a formal complaint with the Constable's Office. (Docket Entry No. 68-7 at 6). The Precinct 4 Internal Affairs Division concluded that the deputies had committed no violations and closed the complaint as unfounded. (Docket Entry No. 51-18).

The Gorskys sued, alleging violations of their Fourth and Fourteenth Amendment rights. (Docket Entry No. 1). The Gorskys asserted claims for unlawful arrest, illegal entry and search of their home, excessive force, failure to supervise as to Corporal Rivaux, and municipal liability as to Harris County. (Docket Entry No. 1 at 13–15). Each claim is considered below.

## II.    The Legal Standards

### A.    The Summary Judgment Standard

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quotations omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and

---

[3] Tex. Penal Code Ann. § 38.15 (West 2015).

identifying the record evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating that there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (alteration omitted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate "the precise manner in which" that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019) (quotation omitted). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650,

656 (2014) (per curiam)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.    The Qualified Immunity Standard

The deputies assert qualified immunity, arguing that it precludes the § 1983 damages claims that the Gorskys assert.  Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "In reviewing a motion for summary judgment based on qualified immunity, [courts] undertake a two-step analysis." *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. 2014).  "First, [courts] ask whether the facts, taken in the light most favorable to the plaintiffs, show the officer's conduct violated a federal constitutional or statutory right." *Id.* (citing *Tolan*, 572 U.S. at 655–56).  "Second, [courts] ask 'whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)).  "A court has discretion to decide which prong to consider first." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  "Claims of qualified immunity must be evaluated in the light of what the officer knew at the time he acted, not on facts discovered subsequently." *Luna*, 773 F.3d at 718.  But "[a]s the Supreme Court has recently reaffirmed, 'in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* (quoting *Tolan*, 572 U.S. at 651).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar County*, 560 F.3d 404, 410 (5th Cir. 2009) (quotations omitted). "When considering a defendant's entitlement to qualified immunity, [a court] must ask whether the law so clearly and unambiguously prohibited his conduct that 'every reasonable official would understand that what he is doing violates [the law].'" *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)). "To answer that question in the affirmative, [the court] must be able to point to controlling authority — or a 'robust consensus of persuasive authority' — that defines the contours of the right in question with a high degree of particularity." *Id.* (quoting *Al-Kidd*, 563 U.S. at 742).

"Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotations omitted). "[W]hile the Supreme Court has stated that 'courts should define the 'clearly established' right at issue on the basis of the 'specific context of the case,' it has also recently reminded [courts] that [they] 'must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.'" *Luna*, 773 F.3d at 724–25 (quoting *Tolan*, 572 U.S. at 657). A plaintiff has the burden of overcoming the qualified immunity defense. *Bennett v. City of Grand Prairie*, 883 F.2d 400, 408 (5th Cir. 1989).

### III.  Analysis

#### A.  The Summary Judgment Evidence

Harris County's and the officers' summary judgment evidence consists of:

1. call records and incident reports from the Gorskys' and Koczmans' disputes, from 2013 to 2018, (Docket Entry Nos. 48-1, 48-3, 48-23, 51-1, 51-5, 54-1, 54-4);

2. the Gorskys' divorce filings, (Docket Entry No. 54-2);

3. security-camera footage from the Koczmans' house, (Docket Entry Nos. 48-4, 48-6, 48-8, 48-14, 51-14, 54-3, 54-8);

4. the officers' police-audio recordings and transcripts, (Docket Entry Nos. 48-5, 48-13, 51-12, 51-15, 51-16, 51-17, 51-22, 54-5, 54-9, 54-13);

5. Deputy Berry's deposition testimony and affidavit, (Docket Entry Nos. 51-13, 51-20, 54-16);

6. Corporal Rivaux's deposition testimony, (Docket Entry Nos. 48-12, 51-23, 54-14);

7. Deputy Small's deposition testimony and affidavit, (Docket Entry Nos. 51-9, 51-19, 54-17);

8. Deputy Guajardo's deposition testimony and affidavit, (Docket Entry Nos. 51-10, 51-21);

9. sworn statements from Deputies Berry and Guajardo, (Docket Entry Nos. 51-6, 51-7, 51-11);

10. police-practices expert Roger Clark's deposition testimony, (Docket Entry No. 48-20);

11. law-enforcement expert Jay Coons's affidavits, (Docket Entry Nos. 48-22, 48-24);

12. records from the Gorskys' internal-affairs complaint against the officers, (Docket Entry Nos. 48-7, 48-21, 51-18, 51-24, 54-6, 54-10);

13. records of a civil case filed by Ms. Koczman against Ms. Gorsky, (Docket Entry No. 51-3);

14. records of a criminal charge filed against Mr. Gorsky, (Docket Entry No. 51-4);

15. the incident report of the criminal mischief charge against Ms. Gorsky, (Docket Entry No. 51-8);

16. the Gorskys' medical records, some filed under seal, (Docket Entry Nos. 48-15, 51-25, 54-7, 54-15);

17. Mr. Gorsky's deposition testimony, (Docket Entry Nos. 48-10, 51-26, 54-11);

18. Ms. Gorsky's deposition testimony, (Docket Entry Nos. 48-2, 48-11, 51-2, 54-12);

19. records detailing complaints filed against Precinct 4 officers, (Docket Entry Nos. 54-18, 48-19);

20. the Gorskys' interrogatory responses, (Docket Entry No. 54-19);

21. Ms. Gorsky's psychological evaluation, (Docket Entry No. 54-22);

22. the sworn affidavit of Michael Combest, assistant chief for Precinct 4, (Docket Entry Nos. 51-27, 54-21); and

23. the Harris County Precinct 4 Constable Department policy manuals, (Docket Entry Nos. 48-16, 48-17, 48-18).

In response, the Gorskys submitted:

1. the officers' deposition testimony, (Docket Entry Nos. 68-1, 68-2, 68-3, 68-4);

2. the Gorskys' deposition testimony and affidavits, (Docket Entry Nos. 68-5, 68-6, 68-7);

3. police-practices expert Roger Clark's affidavit and resume, (Docket Entry Nos. 68-8, 68-10); and

4. a memo detailing complaints filed against other officers, Corporal Drummond and Deputy Glaze, (Docket Entry No. 68-9).

### B.    Evidentiary Objections

#### 1.    *The Gorskys' Declarations*

The defendants have objected to Mr. and Ms. Gorsky's declarations, arguing that they are "sham affidavits" offered to "dodge . . . cross-examination and allow both Plaintiffs to embellish their alleged harm." (Docket Entry No. 72 at 15; Docket Entry No. 74 at 7–9). In the Fifth Circuit, "a plaintiff may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation." *Doe ex rel. Doe v. Dall. Indep.*

*Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). The court may "refuse to consider [a] declaration" or affidavit as competent summary judgment evidence if the party made inconsistent statements between the declaration and a deposition. *Hacienda Records, L.P. v. Ramos*, 718 F. App'x 223, 235 (5th Cir. 2018) (citing *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43–44 (2d Cir. 2000)).

In *Hackett v. United Parcel Service*, 736 F. App'x 444, 449 (5th Cir. 2018), the Fifth Circuit affirmed the district court's decision to disregard an affidavit on summary judgment based on significant differences between the affidavit and the affiant's deposition testimony. The plaintiff stated in his affidavit that he had trained another employee "rather extensively on a wide variety of topics." *Id.* In his deposition, the plaintiff testified that he had provided the employee "very limited training on a single subject." *Id.* The plaintiff also stated in his affidavit that the other employee's supervisor did not talk with him about his interaction with the other employee. *Id.* In the plaintiff's deposition, he testified that he and the supervisor had discussed the matter multiple times. *Id.* The Fifth Circuit held that the district court did not err in disregarding the affidavit because the plaintiff offered only "bare assertions that these differences are reconcilable without any evidentiary support," with "no explanation for the change in his account." *Id.*

Similarly, in *Hacienda Records, L.P. v. Ramos*, 718 F. App'x at 235, the Fifth Circuit affirmed a district court's decision to disregard a declaration because "inconsistencies abound[ed] between [the defendant's] declaration and deposition testimony." During his

deposition, the defendant admitted that he had probably received an advance payment, but that he could not remember whether he had been paid royalties. *Id.* Yet in his declaration—sworn only four days before his deposition—the defendant stated that he never received the advance payment and that he was never paid royalties. *Id.* The Fifth Circuit held that "[m]emories, of course, may fade over time; but, that is a far cry from [the defendant], at his deposition, being unable to recall many of the events he had stated as fact in his declaration, just four days prior." *Id.*

The inconsistencies that the officers highlight here are not unexplained contradictory statements between declaration and deposition, as in *Hackett* and *Hacienda Records*. They instead reflect Ms. Gorsky's inability or failure to hear Deputy Small's police-audio recording. (Docket Entry No. 53 at 21; Docket Entry No. 72 at 26–27). Ms. Gorsky states in her declaration that the officers came into the house before knocking. (Docket Entry No. 68-6 at 2–3). When asked in her deposition, after hearing knocking in the recording, which showed that the officers knocked on the door, why they would if they were already inside, Ms. Gorsky could not explain why. (Docket Entry No. 54-12 at 111–12). Ms. Gorsky testified that in the audio recording, she could not hear any officer push her into a chair, as she had described in her declaration; she could not hear any officer call her "bitch"; and she could not identify sounds of officers poking her or touching her breasts, as she described in her declaration. (Docket Entry No. 54-12 at 112–13, 182–85; Docket Entry No. 68-6 at 4–5). Her testimony and declaration are not inconsistent. It is not inconsistent to insist that something happened but be unable to hear it on an audio recording of the event. And the officers have not pointed to specific contradictions between Mr. Gorsky's declaration and deposition testimony, sufficient to persuade the court to disregard his declaration.

The defendants' request to strike or disregard Jacob and Olesya Gorsky's declarations is denied.

### 2. *Roger Clark's Affidavit*

The defendants have also objected to the Gorskys' use of police-practices expert Roger Clark's affidavit, arguing that it states impermissible legal conclusions. Although expert testimony is not objectionable simply "because it embraces an ultimate issue," an expert's opinion on ultimate issues can be excluded if it is otherwise inadmissible under the Federal Rules of Evidence. Fed. R. Evid. 704. When opinion testimony combines opinions on law and fact, the question is "whether the opinion will 'help the trier of fact to understand the evidence or to determine a fact in issue.'" 29 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 6284 (2d ed.) (quoting Fed. R. Evid. 702). Expert opinions that a defendant did, or did not, violate the law are inadmissible. *See* Fed. R. Evid. 702; *United States v. Thomas*, 847 F.3d 193, 206 (5th Cir. 2017) ("This rule and the other Federal Rules of Evidence 'afford ample assurances against the admission of opinions which would merely tell the jury what result to reach.'"); *Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009).

Roger Clark opines in his affidavit that the officers' "entry into the Gorskys' residence (as recorded) was a blatant violation of the [Gorskys'] constitutional rights," and that "the force used against the Gorskys was excessive and unlawful."[4] (Docket Entry No. 68-10 at 8). This is not admissible summary judgment evidence; it merely tells the jury which legal result to reach. The court disregards Clark's affidavit to the extent it provides legal conclusions.

---

[4] The Gorskys state that Roger Clark opined that the officers used unlawful force, (Docket Entry No. 76 at 24), but the court has not found where in the record Clark stated this. Even if Clark had stated that the force was unlawful, that statement would be inadmissible as a legal conclusion.

## C.     The Unlawful Arrest Claim

Mr. Gorsky claims the officers unlawfully arrested or detained him when they handcuffed him and placed him in the patrol car.  Unlawful detention and arrest claims "implicate the Fourth Amendment's proscription against unreasonable seizures."  *Peterson v. City of Fort Worth*, 588 F.3d 838, 845 (5th Cir. 2009).  In general, there are three types of encounters between police and individuals.  The first type is the "consensual encounter," in which the individual willingly agrees to speak to police.  This type of encounter may be initiated by police officers without any objective level of suspicion.  Without more, a consensual encounter does not amount to a Fourth Amendment "seizure."  *United States v. Cooper*, 43 F.3d 140, 145 (5th Cir. 1995) (citing *Florida v. Bostick*, 501 U.S. 429, 435 (1991)).  The second type of encounter, the "limited investigative stop," is permissible if there is a "reasonable suspicion" that a person has committed or is about to commit a crime.  The third type of encounter, an arrest, must be based on probable cause.  *Id.* at 146.

A consensual encounter between an officer and a citizen "can be transformed into a seizure or detention within the meaning of the Fourth Amendment, if, in view of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *INS v. Delgado*, 466 U.S. 210, 215 (1984).  The test is objective.  *Michigan v. Chesternut*, 486 U.S. 567, 573–74 (1988).  A court examines the totality of the circumstances to determine whether a reasonable person would have believed that he was free to leave or free to refuse to consent to a search.  *See Bostick*, 501 U.S. at 437; *United States v. Gonzales*, 79 F.3d 413, 420 (5th Cir. 1996), *cert. denied*, 519 U.S. 869 (1996).  This objective analysis, focusing on the officers' conduct and the context in which it occurs, allows law-enforcement officers to know

whether their conduct in continuing to detain, or search an individual, will violate the Fourth Amendment. *Chesternut*, 486 U.S. at 573–74.

Only unreasonable searches and seizures violate the Fourth Amendment. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (stating that the "touchstone of the Fourth Amendment is reasonableness" (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991))). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Id.* While police questioning is not itself a seizure, continued detention without a reasonable suspicion that the individual has committed or is about to commit a crime violates the Fourth Amendment right to be free from unreasonable seizure. *Delgado*, 466 U.S. at 216 (citing *Brown v. Texas*, 443 U.S. 47, 49 (1979)).

Limited investigative stops or detentions require a "reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry*, 392 U.S. at 21). Although "[r]easonable suspicion" is "considerably easier for the Government to establish than probable cause," *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993), *cert. denied*, 511 U.S. 1060 (1994) (citing *United States v. Wangler*, 987 F.2d 228, 230 (5th Cir. 1993)), individualized suspicion of wrongdoing is required. *See Chandler v. Miller*, 520 U.S. 305, 308 (1997). An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that [limited] intrusion." *Terry*, 392 U.S. at 21; *accord United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Delaware v. Prouse*, 440 U.S. 648, 653–55 (1979). Courts examine "whether the officer's action was justified at its inception"—that is, whether reasonable suspicion was then present—and whether the stop "was reasonably related in scope to the

circumstances which justified the interference in the first place." *See Terry*, 392 U.S. at 451; *Sokolow*, 490 U.S. at 19–20.

A warrantless arrest violates a suspect's Fourth Amendment rights "if the arresting officer lacks probable cause to believe that the suspect has committed a crime." *Bodzin v. City of Dallas*, 768 F.2d 722, 724 (5th Cir. 1985). "Probable cause is established by 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Arizmendi*, 919 F.3d at 897 (quoting *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009)). The probable-cause analysis is objective.

"Because probable cause deals with probabilities and depends on the totality of the circumstances, . . . it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quotations omitted). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such an activity.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "Probable cause 'is not a high bar.'" *Id.* (quoting *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014)). The Fifth Circuit's "objective standard" means that a court "will find that probable cause existed if the officer was aware of facts justifying a reasonable belief that an offense was being committed, whether or not the officer charged the arrestee with that specific offense." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153–54 (2004)).

The parties dispute whether the officers arrested Mr. Gorsky or detained him for a brief period. A seizure is an arrest "if 'a reasonable person in the suspect's position would have

understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Johnson v. Thibodaux City*, 887 F.3d 726, 732–33 (5th Cir. 2018) (quoting *Turner v. Lieutenant Driver*, 848 F.3d 678, 692–93 (5th Cir. 2017)).

The Fifth Circuit has affirmed a district court's conclusion that police arrested, rather than detained, a plaintiff on similar facts. In *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007), police officers threatened the plaintiff with arrest if she did not let the officers search her home. When the plaintiff responded by saying "[h]ave at it," the officers handcuffed and placed her in their patrol car for 30 to 45 minutes. *Id.* The Fifth Circuit held that "[o]n these facts, a reasonable person in [the plaintiff's] situation would surely believe that she had been restrained to an extent that normally accompanies a formal arrest." *Id.*

Here, the undisputed evidence, or the evidence viewed favorably to the nonmovant, shows that Deputy Guajardo told Mr. Gorsky that if he hindered their investigation, they could "get in this house, put [him] in handcuffs, and take [him] to jail." (Docket Entry No. 51-12 at 4). Mr. Gorsky responded by telling Deputy Guajardo to handcuff him. (*Id.*). Corporal Rivaux asked Mr. Gorsky if he wanted "to call for [his] wife and tell her that [he is] going to jail." (*Id.*). After Deputy Guajardo handcuffed Mr. Gorsky, Corporal Rivaux told Ms. Gorsky, "[y]eah, your husband's going to jail." (*Id.* at 6). Corporal Rivaux then told Mr. Gorsky to "have fun in Harris County," referring to the Harris County Jail. (Docket Entry No. 68-3 at 85). The officers placed Mr. Gorsky in handcuffs in the patrol car and kept him there for over an hour. (Docket Entry No. 68-5 at 28). The officers' comments to Mr. Gorsky that he was going to jail, and the facts that the officers handcuffed him and placed him in their patrol car for over an hour, would have led a reasonable person in Mr. Gorsky's position to believe that he was under arrest.

The officers needed probable cause. They did not have it. Corporal Rivaux told Mr. Gorsky that by refusing to fetch Ms. Gorsky and trying to shut the front door, he was hindering their investigation and could be arrested. (Docket Entry No. 68-1 at 64). The parties agree that Corporal Rivaux was threatening arrest for the misdemeanor offense of "Interference with Public Duties," Tex. Penal Code Ann. § 38.15 (West 2015). The statute provides:

> (a) A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with:
>
> (1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law;
>
>     . . . .
>
> (d) It is a defense to prosecution under this section that the interruption, disruption, impediment, or interference alleged consisted of speech only.

Tex. Penal Code Ann. § 38.15 (West 2015).

The Fifth Circuit has affirmed convictions under Texas Penal Code § 38.15 when a defendant fails to comply with an officer's instructions. In *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017), the plaintiff sued a police officer who arrested him under § 38.15 after the plaintiff failed to comply with the officer's instructions to move his truck, which was blocking the officer's access to certain property. The Fifth Circuit held that the plaintiff's conduct did not fall under the speech exception. *Id.* The court stated that "Texas courts have found that failure to comply with an officer's instructions under similar circumstances violates Texas Penal Code § 38.15 and is not protected speech." *Id.* The court held that "a reasonable officer could have believed that there was a fair probability that [the plaintiff] violated Texas Penal Code § 38.15 by failing to comply with [the officer's] instruction to move the truck." *Id.*

The Fifth Circuit has held that probable cause does not exist under § 38.15 when an officer acts without legal authority by attempting to enter a home without a warrant or a basis to enter without a warrant.  In *Freeman v. Gore*, police officers attempted to enter the plaintiff's house without a warrant to search for her son.  *Freeman*, 483 F.3d at 408.  The plaintiff yelled at the officers and refused to let them into the home, despite their instructions to allow them entry. *Id.*  The officers arrested her for interference under § 38.15, and she sued.  *Id.* at 408–09.  The district court denied the officers' motions for summary judgment, holding that because the officers had no right to search the plaintiff's house, they could not have had probable cause to arrest the plaintiff for interference based on her refusal to follow their directions to allow them to enter the home.  *Id.* at 409.  The district court stated that the plaintiff had only "'interfered' with the deputies' attempt to conduct an unlawful, warrantless search of her home, not with the deputies' general ability to investigate" her son's whereabouts.  *Id.* at 413.  The Fifth Circuit affirmed, holding that while the plaintiff's actions consisted exclusively of speech, a reasonable officer also "would have known that he could not lawfully search [the plaintiff's] home, and [the plaintiff] was not, therefore, interfering with the exercise of any authority granted to the deputies by law."  *Id.* at 414.

The deputies and Corporal Rivaux instructed Mr. Gorsky to find his wife inside the house and produce her for questioning.  He failed to comply.  But his conduct was limited to preventing the officers from illegally entering his home without a warrant to question his wife.  Because the officers had no warrant and could not legally enter the Gorskys' home, Mr. Gorsky was not interfering with the exercise of lawful authority when he tried to close his front door and did not allow the officers in.  He did not give the officers probable cause to arrest him for interfering because reasonable officers would have known that they could not lawfully enter or search the

home without a warrant. The present record does not allow the court to find that, as a matter of law, the officers had probable cause to arrest Mr. Gorsky for interference under § 38.15.

The record also presents factual disputes material to determining whether the officers' conduct was objectively reasonable, precluding a finding of qualified immunity on this record. There are disputed facts material to determining whether a reasonable officer would recognize that Mr. Gorsky's refusal to allow the officers to enter the home or to search it, could justify an arrest or create probable cause to arrest Mr. Gorsky for another offense. *See, e.g.*, *Steagald v. United States*, 451 U.S. 204, 213–14 (1981) (the entry and search of a home for a person requires a search warrant); *Freeman*, 483 F.3d at 416 (the plaintiff's "refusal to consent to a warrantless search of her home could neither itself justify an arrest nor create probable cause to arrest [the plaintiff] for another offense"). These disputes do not warrant finding qualified immunity for their arresting Mr. Gorsky on the present record.[5]

Summary judgment is denied on Mr. Gorsky's unlawful arrest claim.

### D.     The Illegal-Entry-After-The-Arrest Claim

The Gorskys claim that the officers illegally entered their home, both by placing their feet in the doorframe and by coming inside after arresting Mr. Gorsky. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citation and quotations omitted). "Although as a general matter,

---

[5]   The Gorskys appear to abandon their unlawful-arrest claim arising out of the officers' actions in handcuffing Ms. Gorsky by failing to address it in their response to the officers' motions for summary judgment. The record evidence shows that the officers had probable cause to arrest or detain Ms. Gorsky

warrantless searches 'are *per se* unreasonable under the Fourth Amendment,' there are 'a few specifically established and well-delineated exceptions' to that general rule." *City of Ontario v. Quon*, 560 U.S. 746, 760 (2010) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also Rice v. Relia Star Life Ins. Co.*, 770 F.3d 1122 (5th Cir. 2014) ("There are, however, circumstances in which a warrantless entry into a home is not a constitutional violation.").

1.     *The Foot-in-the-Doorway Entry*

The Gorskys claim that when Corporal Rivaux and Deputy Berry placed their booted feet in the frame of the front door, preventing Mr. Gorsky from closing the door, they illegally entered the Gorskys' home, violating their Fourth Amendment rights. The officers respond that the "exigent circumstances" exception to the warrant requirement applies because they stuck their feet in the doorframe to prevent Mr. Gorsky from slamming the door in their faces in order to protect "officer safety."

"Under the exigent circumstances exception to the warrant requirement, the Supreme Court has recognized that police officers are not required to obtain a warrant where 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *Rice*, 770 F.3d at 1131 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

The parties dispute whether the officers acted out of safety concerns. Deputy Berry stated in his sworn affidavit that "[f]or safety reasons," he placed his "foot in the doorway to keep the door from shutting." (Docket Entry No. 51-13 at 3). In his deposition, Deputy Berry testified that Mr. Gorsky "became agitated," and "wanted to shut the door." (Docket Entry No.

---

for the criminal mischief charge, as they had seen security-camera footage showing a woman who appeared to be Ms. Gorsky vandalizing the Koczmans' car.

68-1 at 47).  Later in the deposition, Deputy Berry testified that Mr. Gorsky "did attempt to slam the door."  (*Id.* at 75).  But Corporal Rivaux testified in his deposition that he was "[n]ot a hundred percent sure" whether Mr. Gorsky had tried to slam the door, and that Mr. Gorsky "probably did not" because Corporal Rivaux did not state that in his report.  (Docket Entry No. 68-3 at 115).  A transcript of Deputy Small's audio recording from the incident shows that Mr. Gorsky asked the officers to "[g]et your shoe," to which Deputy Guajardo replied, "That is not an option."  (Docket Entry No. 51-12 at 4).

Taken in the light most favorable to the Gorskys, the evidence shows that Deputy Berry and Corporal Rivaux placed their boot-clad feet in the doorframe to prevent Mr. Gorsky from closing the door before he tried to do so, although he conveyed his intention to close the door once the officers moved out of the way.  The officers had no warrant to enter and search the Gorskys' home.  If the exigent-circumstances exception to the Fourth Amendment's warrant requirement does not apply, because the officers placed their feet in the doorway with no objectively reasonable threat to their safety, qualified immunity requires the court to ask "whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known."  *Luna*, 773 F.3d at 718.

The case law at the time had not clearly established whether placing a foot in the doorframe to prolong a consensual encounter constitutes an illegal entry under the Fourth Amendment.  The Supreme Court has held that "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'"  *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (quoting *Kentucky v. King*, 563 U.S. 452, 469–70 (2011)).  But there is no de minimis exception to the Fourth Amendment.  "[A]ny physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much."  *Kyllo v.*

*United States*, 533 U.S. 27, 37 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)).

The Gorskys have pointed to only a single unpublished case from the Northern District of Georgia to support their argument that an officer's boot in a doorframe to prevent the door from closing is enough to violate the Fourth Amendment.[6] For a right to be clearly established for qualified immunity purposes, there must be "controlling authority — or a 'robust consensus of persuasive authority' — that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371–72 (quoting *Al-Kidd*, 563 U.S. at 742).

This court has not found, and the parties have not cited, controlling Fifth Circuit or other precedent. Admittedly, the line between entry and about to enter can be hard to draw. *Dalcour v. City of Lakewood*, 492 F. App'x 924, 928 (10th Cir. 2012), is instructive. A police officer knocked on the door of the plaintiff's house, and an occupant answered the door. *Id.* The officer placed her foot in the doorframe to keep the occupant from closing the door and called for backup while the occupant repeatedly tried to close the door on the officer. *Id.* The Tenth Circuit held that Supreme Court precedent clearly establishes that "a reasonable officer should have known that placing a foot into the doorway amounted to an entry of the home for Fourth Amendment purposes." *Id.* at 934. But the Sixth Circuit disagreed and explained that "[t]he relevant [Supreme Court] cases deal with intrusions that were unauthorized *ab initio*, not those that prolong an otherwise consensual encounter." *Smith v. City of Wyoming*, 821 F.3d 697, 714 (6th Cir. 2016). In *Smith*, the Sixth Circuit surveyed the case law and found no cases except for *Dalcour* in the Tenth Circuit. *Id.*

---

[6] *Hanie v. City of Woodstock*, No. 1:06-cv-889-RWS, 2008 WL 476123, *7 (N.D. Ga. Feb. 19, 2008).

The lack of Fifth Circuit case law, or case law from other circuits, and the disagreement between circuits on the clarity of Supreme Court precedent, indicate that even if Corporal Rivaux and Deputy Berry violated the Gorskys' Fourth Amendment rights by merely placing their feet in the doorframe to prevent Mr. Gorsky from closing the door, they did not violate clearly established law. To the extent the Gorskys' illegal entry claim is based on the officers placing their feet in the doorframe, the officers are entitled to qualified immunity.

## 2. The Officers' Entry into the Gorskys' Home

The Gorskys claim that the officers violated their Fourth Amendment rights by entering their house after handcuffing and removing Mr. Gorsky from the front-door area. "A warrantless entry into and search of a dwelling is presumptively unreasonable unless consent is given or probable cause and exigent circumstances justify the encroachment." *United States v. Santiago*, 410 F.3d 193, 198 (5th Cir. 2005) (citing *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001)). "In order to satisfy the consent exception, the government must prove, 'by a preponderance of the evidence,' that 'consent to the search was freely and voluntarily given.'" *Santiago*, 410 F.3d at 198–99 (citing *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002) (quoting *United States v. Gonzales*, 121 F.3d 928, 938 (5th Cir. 1997))). "The voluntariness of consent is a question of fact to be determined from a totality of the circumstances." *Id.* at 199 (quoting *United States v. Cooper*, 43 F.3d 140, 144 (5th Cir. 1995)).

A court considers six factors to evaluate whether consent was voluntary, "all of which are relevant, but no one of which is dispositive or controlling." *Id.* (citing *Solis*, 299 F.3d at 436). Those factors are: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's

education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *Id.* (quoting *United States v. Olivier-Becceril*, 861 F.2d 424, 426 (5th Cir. 1988)). "The fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976).

The officers have presented limited evidence that Ms. Gorsky voluntarily consented to their entering the home. After Mr. Gorsky was first handcuffed in the front doorway, Corporal Rivaux knocked on the Gorskys' front door and called out, "Police Department." (Docket Entry No. 51-12 at 5; Docket Entry No. 51-15). Ms. Gorsky came to the door. Corporal Rivaux asked her if she had "egged a vehicle earlier." (Docket Entry No. 51-12 at 6). After a brief exchange over whether Ms. Gorsky had egged the neighbor's car, and whether her son was asleep inside, Corporal Rivaux asked Ms. Gorsky "well, can we come in and put you right here so we can see him?" (*Id.* at 7–10). Ms. Gorsky answered, "Yeah, yeah." (*Id.* at 10). The recorded audio confirms this dialogue. (Docket Entry No. 51-15). Beyond Ms. Gorsky's recorded "[y]eah, yeah," the officers have not argued that Ms. Gorsky "freely and voluntarily" consented.

The Gorskys assert, without pointing to record evidence or legal authority, that Ms. Gorsky consented "under great duress." (Docket Entry No. 76 at 20). The Gorskys' version of the facts differs from the officers' as to the circumstances of the officers' entry. Ms. Gorsky states in her declaration that after hearing "a commotion in [her] front foyer," she left her bedroom to look at the foyer from across the house and saw "only [the] wide opened front door with 2 or 3 large dark-dressed men and my husband facing me with his hands behind him." (Docket Entry No. 68-6 at 2). She states that Deputy Berry had "found the foyer light and turned it on. One of the men knocked on the side of the wide-opened front door and yelled 'police department' [a] few times." (*Id.* at 3). She "saw [her] husband on the porch barefoot and in

underwear, handcuffed and bent forward, shouting 'stop, stop.'" (*Id.*). Ms. Gorsky states that after Corporal Rivaux "ordered somebody on the porch to 'take [Mr. Gorsky] away,'" and "without explaining anything or offering [her] to get dressed, police rudely turned [her] around and handcuffed [her] behind [her] back." (*Id.*). Corporal Rivaux then "grabbed [her] naked shoulders, twisted [her] around and, with his face inches from [her] face stuck his finger in [her] bare chest and said 'you egged the car.'" (*Id.*) "From that moment on, [she] was all but petrified under severe stress and duress." (*Id.*). About two minutes later, according to Ms. Gorsky, Deputies Berry and Small "joined into the foyer and [Corporal Rivaux] asked if they all can come in into the dining room"; before she could "even comprehend the goings-on or protest, they all moved to the dining room" and "pushed [her] in a chair." (*Id.* at 4).

The officers argue that the audio recording requires the court to believe the officers' version in deciding their summary judgment motion. (Docket Entry No. 51 at 20 n.60). The officers cite *Scott v. Harris*, 550 U.S. 372, 380 (2007), for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." But in *Scott*, a video recording showed the respondent's car "[race] down narrow, two-lane roads in the dead of night" and "swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit." *Id.* at 379. Despite the videotape, the respondent asserted that "there was little, if any, actual threat to pedestrians or other motorists, as the roads were mostly empty and [respondent] remained in control of his vehicle." *Id.* at 378. The Supreme Court held that the "[r]espondent's version of events is so utterly discredited by the

record that no reasonable jury could have believed him," and that the court, at summary judgment, should have viewed the facts as depicted by the videotape. *Id.* at 380–81.

The Fifth Circuit has narrowed *Scott* to cases in which a party's version of events is so "blatantly contradicted" by documentary evidence that "no reasonable jury could believe" that party's version. In *Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013), the appellant argued that because a video recording partially captured the fight at issue, the court should not view the summary judgment evidence in the light most favorable to the appellee. *Id.* The Fifth Circuit disagreed, holding that the video was "too uncertain" to discount the appellee's version of events. *Id.* The video began with the parties already yelling, showed about five people involved—more than the parties—and showed no faces until the appellee was already injured and on his knees. *Id.* Because the video did not clearly show "every particular element of the altercation," the court held it did not "blatantly contradict" the appellee's version of the facts, and on summary judgment, the court should still view the facts in the light most favorable to the appellee. *Id.* at 374–75.

The audio that Deputy Small recorded does not blatantly contradict Ms. Gorsky's declaration or deposition testimony. In the recording, an officer knocks on a door, Corporal Rivaux calls out "Police department," and Ms. Gorsky says "hello" and asks, "[w]hat are you doing, guys?" (Docket Entry No. 51-12 at 5; Docket Entry No. 51-15). Corporal Rivaux tells her to "[c]ome on out." (*Id.*). The recording does not include any sound of a door opening after Corporal Rivaux knocks, which supports Ms. Gorsky's testimony that the front door was already opened. (Docket Entry No. 51-15; Docket Entry No. 54-12 at 111; Docket Entry No. 68-6 at 2–3). The recording does not make clear whether the officers were still outside the house or

already inside the foyer, as Ms. Gorsky states. (Docket Entry No. 51-15; Docket Entry No. 68-6 at 2–3).

Deputy Berry also testified in his deposition that Ms. Gorsky was in handcuffs around the time Corporal Rivaux asked to enter the house. (Docket Entry No. 68-4 at 53–54). Corporal Rivaux can be heard asking Ms. Gorsky, "can we come in and put you right here so we can see [your son]," and Ms. Gorsky can be heard saying "yeah, yeah." (Docket Entry No. 51-12 at 10; Docket Entry No. 51-15). But the recording does not clearly indicate whether the officers were outside the home, asking to come in, or already in the foyer, "asking" to come further into the home and to put Ms. Gorsky in the dining room chair, as Ms. Gorsky asserts.

Unlike in *Scott*, in which the video recording clearly showed a car swerving dangerously around traffic, and like in *Ramirez*, in which the video only partially captured the fight at issue, here the audio recording does not reveal where the officers stood when they asked to come in. Because the audio does not blatantly contradict Ms. Gorsky's declaration or deposition testimony as to the officers' entry, the court must take the Gorskys' evidence in the light most favorable to them on summary judgment. Viewed in the light most favorable to the Gorskys, and with disputes resolved in their favor, a reasonable fact finder could find that the evidence shows the officers were standing inside the foyer before Ms. Gorsky came to the door, and that they handcuffed Ms. Gorsky before asking her consent to come in.

The officers have not shown the absence of factual disputes material to determining whether they obtained Ms. Gorsky's free and voluntary consent before they entered the home. The officers point only to Ms. Gorsky's recorded response of "yeah" after they asked her if they could come in; it is unclear, and disputed, if the officers were already in at that point, or whether, under the circumstances, Ms. Gorsky's response was voluntary consent. The disputed record

evidence, taken in the light most favorable to the Gorskys and resolving disputes in their favor, could reasonably show that: (1) the officers handcuffed Ms. Gorsky before asking permission to enter; (2) Corporal Rivaux "grabbed [Ms. Gorsky's] naked shoulders, twisted [her] around and, with his face inches from [her] face stuck his finger in [her] bare chest and told her that she egged the car; (3) Ms. Gorsky watched as the officers placed her handcuffed and underwear-clad husband into the patrol car; (4) no officer told Ms. Gorsky that she could refuse entry into the house; (5) after telling the officers that her son was sleeping, they asked if they could come into her dining room, and; (6) Ms. Gorsky said "yeah, yeah."

The fact of custody, by itself, is not enough to invalidate consent. But the evidence includes that Corporal Rivaux grabbed and twisted Ms. Gorsky's arm. That, combined with her apparent lack of knowledge that she could refuse entry, and her distress in watching the officers put her handcuffed, underwear-clad husband in the patrol car, create factual disputes material to determining whether Ms. Gorsky freely and voluntarily consented to the officers' entry.

Even if the record showed voluntary consent as a matter of law, Mr. Gorsky clearly had refused, and continued to refuse, consent to entry. The Gorskys cite *Georgia v. Randolph*, 547 U.S. 103, 114 (2006), to argue that one co-tenant's objection overrides another co-tenant's consent. 547 U.S. at 114 ("Since the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all."). The Supreme Court later clarified that its holding in *Randolph* "was limited to situations in which the objecting occupant is present." *Fernandez v. California*, 571 U.S. 292, 301 (2014). The Court in *Fernandez* rejected the argument that "the presence of the objecting occupant is not necessary

when the police are responsible for his absence." *Id.* at 302. Instead, the Court held that "an occupant who is absent due to a *lawful* detention or arrest stands in the same shoes as an occupant who is absent for any other reason." *Id.* at 303 (emphasis added). But the Court in *Randolph* stated, in dicta, that consent by a resident might not suffice if there is "evidence that the police have removed the potentially objecting tenant from the entrance [of their home] for the sake of avoiding a possible objection." *Randolph*, 547 U.S. at 121.

The record shows that Mr. Gorsky attempted to close the front door on the officers instead of allowing them to enter, telling them to "get out." While it is undisputed that he was not physically present in the doorway when the officers asked Ms. Gorsky if they could come into the dining room, his absence was due to an unlawful arrest, made without probable cause. The officers removed Mr. Gorsky immediately after he refused to consent to their entry into his home; arrested him after and at least in part because he refused to consent to their entry and instead held him handcuffed in the patrol car in his driveway for an hour. His arrest lacked probable cause. Ms. Gorsky could not have overridden Mr. Gorsky's refusal under the facts asserted, even though they are disputed.

The officers assert qualified immunity. The Gorskys have not directly argued that the officers violated clearly established law. But the Gorskys have argued that it is "a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable," citing *Payton v. New York*, 445 U.S. 573, 586 (1980). (Docket Entry No. 76 at 20). The Gorskys also cite *United States v. Jones*, 239 F.3d at 719, which holds that a "warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents." (Docket Entry No. 76 at 21). The Fifth Circuit had clearly established that consent to a warrantless entry and search must be freely and voluntarily given. *See, e.g.*,

*Santiago*, 410 F.3d at 198–99; *Solis*, 299 F.3d at 436; *Gonzales*, 121 F.3d at 938. The validity of Ms. Gorsky's consent rests on factual disputes. These disputes prevent a finding that, on the present record, as a matter of law, the officers are entitled to qualified immunity.

### 3. The Officers' Search of the Home

The Gorskys originally asserted claims for both the officers' entry into their home and for the search of the home. (Docket Entry No. 1 at 13–14). In the Gorskys' response to the officers' motions for summary judgment, however, the Gorskys address only the officers' entry. The Gorskys appear to abandon their illegal-search claim. But the record evidence shows that Deputy Small did go into the home to "check on" the son, and "disappeared into the house for a while." (Docket Entry No. 68-6 at 4). The same factual disputes over Ms. Gorsky's consent prevent finding that, as a matter of law, Deputy Small is entitled to qualified immunity for any search for Ms. Gorsky's son.

Summary judgment is denied on the Gorskys' illegal entry claim, to the extent it is based on the officers' entry after handcuffing and removing Mr. Gorsky, and on the search for the son as to Deputy Small. Summary judgment is granted on the illegal entry claim for the officers' conduct of placing a foot in the doorway to prevent Mr. Gorsky from closing it, and on the illegal search claim as to Deputies Guajardo and Berry, and Corporal Rivaux.

### E. Excessive Force

The Gorskys claim that the officers used excessive force during the encounter.[7] "To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate:

---

[7] Although the Gorskys do not specify against which officer they bring the excessive-force claims, the Gorskys identify only Corporal Rivaux as having used any force on them. (Docket Entry No. 76 at 22). Corporal Rivaux stated in his deposition that Deputy Guajardo was the officer who handcuffed Mr. Gorsky. (Docket Entry No. 68-3 at 85). The Gorskys state in their depositions that neither Deputy Berry

(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quotations omitted). "[W]hether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). The "'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. An "excessive force claim is separate and distinct from [an] unlawful [detention] claim, and [the court] must therefore analyze the excessive force claim without regard to whether the [detention] itself was justified." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007).

A court considers only the information available to the officers at the time. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. A court must also recognize that officers often must make split-second decisions in stressful situations. *Id.* at 397.

### 1. Jacob Gorsky

Mr. Gorsky's version of events differs drastically from the officers' testimony. Mr. Gorsky stated in his deposition that "they turned [him] around, twisted [his] hands forward

---

nor Deputy Small used any force on them. The excessive force claims are analyzed as to Corporal Rivaux and Deputy Guajardo, since the officers dispute who handcuffed Mr. Gorsky.

behind [his] back . . . [a]nd it immediately caused [him] a lot of pain. . . . [he] screamed actually even." (Docket Entry No. 68-5 at 26).

Deputy Small's audio recording contradicts Mr. Gorsky's testimony that he screamed while the officers handcuffed him. The recording depicts an officer telling Mr. Gorsky "[y]ou either [call Ms. Gorsky], or I put you in handcuffs right now. What do you want?" (Docket Entry No. 51-12 at 4). The sound of handcuffs clicking is audible, but Mr. Gorsky does not scream. (Docket Entry No. 51-15). Security-camera footage shows an officer leading Mr. Gorsky by the arm, in handcuffs, across the lawn to the patrol car. (Docket Entry No. 51-14). Mr. Gorsky testified, after watching the footage, that the officer escorted and pushed him across the lawn rather than dragging him, as Mr. Gorsky had previously stated. (Docket Entry No. 68-5 at 52).

The officers argue that bruising from overly tight handcuffs as a matter of law is a de minimis injury that does not support an excessive force claim. The Fifth Circuit has previously held that excessively tight handcuffing, without more, does not constitute excessive force. *See Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007) (summary judgment was warranted on the plaintiff's excessive force claim because her most substantial injury was bruised wrists from handcuffs); *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) ("[H]andcuffing too tightly, without more, does not amount to excessive force.").

But the Fifth Circuit, in *Alexander v. City of Roundrock*, 854 F.3d 298, 309 (5th Cir. 2017), recently clarified that "the extent of injury necessary to satisfy the injury requirement" is "directly related to the amount of force that is constitutionally permissible under the circumstances." The court explained:

Although a de minimis injury is not cognizable, the extent of injury necessary to satisfy the injury requirement is directly related to the amount of force that is constitutionally permissible under the circumstances. Any force found to be objectively unreasonable necessarily exceeds the de minimis threshold, and, conversely, objectively reasonable force will result in de minimis injuries only. Consequently, only one inquiry is required to determine whether an officer used excessive force in violation of the Fourth Amendment. In short, as long as a plaintiff has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force.

*Id.* (quotation marks, citations, and modifications omitted). In light of *Alexander*, the question here is not whether Mr. Gorsky's injuries were de minimis; the question is whether it was objectively reasonable under the circumstances for the officers to twist Mr. Gorsky's arm behind his back, allegedly causing him to scream in pain.

*Bush v. Strain*, 513 F.3d 492, 500–01 (5th Cir. 2008), is instructive. The Fifth Circuit explained that, when evaluating whether the force used was objectively reasonable, courts "should consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Bush*, 513 F.3d at 501 (quoting *Graham*, 490 U.S. at 396).

Resolving disputes in Mr. Gorsky's favor, he did not threaten the officers, run, or resist arrest. To the contrary, he was barefoot, dressed only in his underwear, told the officers he would call for his wife, and tried to close the door, but while he continued to say he would get his wife. (Docket Entry No. 68-5 at 25–26). The officers lacked probable cause to arrest Mr. Gorsky for refusing to allow the officers to enter his home without a warrant. In this context, there are disputed facts, but it may have been objectively unreasonable for the officers to twist Mr. Gorsky's arm behind his back to apply the handcuffs with such force to cause him to scream in pain.

The officers' and Mr. Gorsky's versions of events are different. Mr. Gorsky apparently appeared to be intoxicated, had threateningly waived a pool rod at the officers earlier in the evening, and tried to slam the front door in the officers' faces, prompting them to block the door with their feet for their own safety. Based on this record, factual disputes material to determining whether the officers acted reasonably in using force while handcuffing Mr. Gorsky prevent finding that the officers are entitled to qualified immunity.

### 2. Olesya Gorsky

Ms. Gorsky bases her excessive force claim on her declaration testimony that after Corporal Rivaux handcuffed her, he "grabbed her naked shoulders, twisted her around and, with his face inches from her face stuck his finger in her bare chest and said 'you egged the car.'" (Docket Entry No. 68-6 at 3; Docket Entry No. 76 at 23). Ms. Gorsky states elsewhere in her declaration that Corporal Rivaux "repeatedly touch[ed] bare parts of [her] body" and at one point "pushed [her] in [her] chest back on the chair." (Docket Entry No. 68-6 at 5). Ms. Gorsky states that she later "noticed bruises where the handcuffs were," and within days she "noticed bruises on the back of [her] legs where [she] was pushed back into the dining room chair." (Docket Entry No. 68-6 at 6).

The officers again contest Ms. Gorsky's evidence, arguing that the police-audio recording contradicts her version of events. The officers argue that they cannot be heard pushing her into the chair, grabbing her shoulders or twisting her around. As with the Gorskys' excessive-force claim for handcuffing Mr. Gorsky, the Gorskys have identified factual disputes material to determining whether Corporal Rivaux acted reasonably in grabbing Ms. Gorsky's wrists, then, after handcuffing her, grabbing her bare shoulders to twist her around, and later, to forcibly push her into a chair, causing bruises, when Ms. Gorsky posed no threat to the officers. These

disputes prevent the court from finding that, as a matter of law, the officers are entitled to qualified immunity on the present record.

Summary judgment is denied as to Deputy Guajardo and Corporal Rivaux on the Gorskys' excessive-force claim.

### F.    Bystander Liability

The Gorskys claim that the officers are liable under a theory of bystander liability because they failed to intervene and prevent the constitutional violations.   But the Gorskys did not plead this cause of action.   They raised it for the first time in their summary judgment response brief.   (Docket Entry No. 1 at 13–16; Docket Entry No. 76 at 25–26).   While the Gorskys included the phrase "failed to intervene" in their complaint, (Docket Entry No. 1 at 14), they referred only to Corporal Rivaux under their supervisory liability cause of action.

"A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."   *Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)).   Summary judgment is granted on the Gorskys' bystander liability claim against the officers because the Gorskys failed to properly raise the claim before responding to the officers' summary judgment motions.

### G.    Supervisory Liability

The Gorskys have also claimed that Corporal Rivaux is liable under a supervisory liability theory for failing to intervene and prevent the constitutional violations, and for failing to properly train or supervise the officers.   "Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability."   *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (citations omitted).   "'A supervisory official may be held liable . . . only

if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)).

To "establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Id.* (quoting *Gates*, 537 F.3d at 435) (emphasis in original). "'A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights.'" *Id.* (quoting *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992)). "A supervisor may also be liable for failure to supervise or train if: '(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Id.* (quoting *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009)).

The Gorskys have failed to direct the court to evidence showing that Corporal Rivaux acted with deliberate indifference or implemented any unconstitutional policy. Even after the court afforded the Gorskys an opportunity to rewrite their summary judgment response, they have presented only the following inadequate argument:

> Deputy Rivaux was the scene supervisor. Deputy Rivaux was aware of what was happening to the Gorskys and had a duty to supervise but failed to intervene and prevent the unreasonable searches and seizures, warrantless entries into the Gorsky's home and excessive force as described above.

(Docket Entry No. 76 at 26). Summary judgment is granted on the Gorskys' supervisory liability claim against Officer Rivaux.

### H. Municipal Liability

To hold Harris County[8] liable for its officers' constitutional violations, the Gorskys must show that (1) the constitutional violation was caused as the direct result of the execution of an official "custom" or "policy"; (2) the custom or policy was approved or sanctioned by county's final policymaker; (3) the final policymaker acted with deliberate indifference; and (4) the custom or policy was the "moving force" behind the violation. *See Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997); *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1416 (5th Cir. 1997) (en banc). "Municipal liability cannot be sustained under a theory of *respondeat superior*. [T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (alteration in original) (citing *Brown*, 520 U.S. at 403; *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)) (quotations omitted).

Official policy "usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Trammell v. Fruge*, 868 F.3d 332, 344 (5th Cir. 2017) (citing *Peterson v. City of Fort Worth*, 588 F.3d 838,

---

[8] Although the Gorskys have also named the Harris County Constable Precinct 4 as a separate defendant, the Gorskys refer to both Harris County and Precinct 4 as a single entity. Nor is the Harris County Constable Precinct 4 an entity capable of being sued. Under Texas law, offices within counties are not legal entities capable of being sued. *See Thomas v. Harris Cty. Sheriff's Dep't*, Civ. A. No. H-18-1800, 2019 WL 1201984, at *2 (S.D. Tex. March 14, 2019) (collecting cases that hold that offices within counties are nonjural entities).

847 (5th Cir. 2009)) (internal quotation marks omitted).  "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct."  *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010); *see also Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) ("Deliberate indifference to claims of such civil rights violations—tantamount to a custom or policy sufficient to support municipal liability under § 1983—may be inferred from a municipality's lack of appropriate response to repeated complaints of such violations.").

"A pattern requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question."  *Peterson*, 588 F.3d at 851 (internal quotation marks and alteration omitted).  "[P]roof of a single instance of unconstitutional activity is [generally] not sufficient for § 1983 municipal liability."  *Valentine Found. v. Uphoff*, 211 F. App'x 276, 278 (5th Cir. 2006) (citing *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)).  "Furthermore, a 'handful' of instances do not constitute a pervasive custom or practice."  *Garza*, 2011 WL 3925020, at *4 (citing *Pineda*, 291 F.3d at 329); *Saenz v. Dall. Cty. Cmty. Coll. Dist.*, 2011 WL 1935742, at *8 (N.D. Tex. May 16, 2011).

The Gorskys argue that the County ratified the officers' conduct by not disciplining them after the Gorskys complained.  (Docket Entry No. 76 at 26–27).  The Gorskys offer Ms. Gorsky's declaration stating that "[Mr. Gorsky] filed a complaint with Internal Affairs, but, after half a year of silence, Internal Affairs informed us his complaints were 'unfounded.'"  (Docket Entry No. 68-6 at 8).  This is "wholly insufficient to satisfy the nonmovants' summary judgment burden."  *See Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992) (a failure to discipline an officer was not sufficient to show the county ratified unconstitutional conduct).

Nor does the Gorskys' testimony that Internal Affairs declined to pursue their complaint show a custom or practice of failing to accept complaints; at most, it shows a single isolated incident. The Gorskys also reference a Harris County Constable Precinct 4 Memorandum from 2009. (Docket Entry No. 68-9). The memorandum reviews complaints alleging excessive force and rude behavior filed against two other officers—Corporal Drummond and Deputy Glaze— and concludes that while most of their complaints were cleared as unfounded, the two officers received a statistically significant increase in complaints. (*Id.* at 1). The Gorskys argue that this shows a practice or custom of allowing excessive force. (Docket Entry No. 76 at 27). But this memorandum undercuts the Gorskys' argument. It recommends closely reviewing the activities of those two officers to verify that they were not using excessive force, and documents how the Precinct required extra training for Corporal Drummond even though most of the complaints were unsubstantiated. (Docket Entry No. 68-9 at 1, 5).

Finally, the Gorskys once again offer the testimony of their expert, Roger Clark, which fares no better here. Clark states that the Precinct 4 "superiors and chain of command has a custom and practice of supporting the egregious conduct of their officers and deliberately looks the other way despite obvious incidents of bad and illegal conduct in the rank and file." (Docket Entry No. 68-10 at 9). This legal conclusion, as before, is inadmissible and is not competent summary judgment evidence. Clark then continues in his affidavit to describe the alleged incidents that support his conclusion by copying—word for word, including spelling errors— allegations in the Gorskys' complaint drawn from unrelated lawsuits regarding two incidents with other officers. (*Compare* Docket Entry No. 1 at 6–13 *with* Docket Entry No. 68-10 at 9– 16). Even taking the Gorskys' evidence as true for summary judgment, Clark's reciting the allegations from other complaints does not show more than two instances of unconstitutional

conduct. This is insufficient to establish a custom or practice to support municipal liability. *See Garza*, 2011 WL 3925020, at *4 (citing *Pineda*, 291 F.3d at 329) ("[A] 'handful' of instances do not constitute a pervasive custom or practice.").

Summary judgment is granted on the Gorskys' claims against Harris County and the Harris County Constable Precinct 4.

## IV.    Conclusion

The defendants' motions for summary judgment are granted in part and denied in part. Summary judgment is granted for all of the individual officer defendants on the Gorskys' claims for bystander liability and supervisory liability. Summary judgment is granted for Deputies Berry and Small on the unlawful arrest and excessive force claims. Summary judgment is granted for Harris County and Harris County Constable Precinct 4 on all claims. Summary judgment is granted for all of the individual officer defendants on the Gorskys' unlawful entry claim to the extent it is based on the officers placing their feet in the doorframe; it is denied to the extent the claim is based on them entering the home after the officers removed Mr. Gorsky. Summary judgment is denied on the illegal search claim as to Deputy Small to the extent it is based on her search for the son; it is granted as to Deputies Guajardo and Berry and Corporal Rivaux. Summary judgment is denied as to Corporal Rivaux and Deputy Guajardo on the Gorskys' unlawful arrest claim to the extent it is based on arresting Mr. Gorsky, and on the Gorskys' excessive force claims.

SIGNED on February 3, 2020, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge